Ray Woods Used Cars, Inc. v. Commissioner.
Ray Woods Used Cars, Inc. v. Commissioner
Docket No. 32062.
United States Tax Court
1952 Tax Ct. Memo LEXIS 76; 11 T.C.M. (CCH) 983; T.C.M. (RIA) 52290; September 30, 1952
Yale B. Griffis, Esq., 207 Empire State Bank Bldg., Dallas, Tex., for the petitioner. John W. Alexander, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves a deficiency of $2,146.23 in income tax for the fiscal year ended May 31, 1949. The issue is whether the balance of $9,685.60 at the close of the taxable year in a reserve account set up by a finance company under an agreement with petitioner for the purchase of notes constitutes taxable income. Findings of Fact The stipulated facts are so found. The petitioner is a Texas corporation organized May 28, 1948, for the purpose of trading in used automobiles. It kept its books and filed its income tax returns on an *77 accrual basis of accounting. Its income tax return for the taxable year was filed with the collector of internal revenue for the second district of Texas. Financial assistance from an automobile finance company was required by petitioner in the conduct of its business. On June 28, 1948, petitioner entered into a written agreement with the Interstate Securities Company, hereinafter referred to as Interstate, for the sale to it of notes, endorsed without recourse, received from retail purchasers for the deferred purchase price of cars. The agreement, to the extent material, read as follows: TERMS AND RATES "The terms and rates under which the notes and contracts will be purchased shall be such as are furnished to the dealer from time to time by I.S.C. as outlined in its printed rate charts. "All of the rights, obligations and duties of the dealer shall be in accordance with the terms and provisions of this contract, and all purchases of 'notes' by I.S.C. shall be upon the security hereof, and in reliance upon this agreement. "If you refund any part of the service charge because an account is prepaid, we agree to a charge to the reserve account for the same percentage of all *78 reserve credited to or paid us on the account as the amount of service refund bears to the amount of the original charge exclusive of insurance premiums. REPOSSESSED CARS "1. I.S.C. or assigns shall repossess all cars and dealer will store such repossessed or recovered cars on his premises without cost to I.S.C. until they are disposed of and, the dealer's possession of such cars shall be merely as a bailee with duty to safely store for I.S.C. at dealer's risk and expense and to re-deliver to I.S.C. on demand. "2. The dealer shall have the privilege of selling such cars, provided they are sold within thirty days of date of repossession, and provided that no repossessed or recovered car shall be sold for an amount less than the balance due I.S.C. unless the permission of I.S.C. is first obtained before such cars are sold. "3. If any repossessed or recovered car shall not have been sold at the end of thirty days after date of repossession, I.S.C. shall have the privilege of obtaining three bids, selling the car to the highest bidder and charging the unpaid balance of the note, less the net proceeds from the sale of the car, to the dealer's reserve account. EXCEPTIONS "In *79 case any credit investigation or any security proves unsatisfactory to I.S.C. after the purchase thereof by them, or if any draft has been honored by I.S.C. in payment for notes or contracts prior to said unsatisfactory investigation, or if any central facts in connection with such notes has been misrepresented to I.S.C. in any manner or form, then on demand dealer agrees to repay to I.S.C. all sums paid by it for such security and interest thereon in cash and/or to honor and pay a draft therefor at any time within a period of thirty (30) days from the date of the purchase of such security by I.S.C. "The fact that I.S.C. may purchase securities from the dealer endorsed "Without Recourse" shall not in any manner release or impair the obligations of the dealer as set out in this contract, and in the event any of the exceptions herein set out shall exist with reference to any one or more notes so endorsed, the words, "Without Recourse" shall be considered as eliminated and the dealer shall have all the obligation of an endorser with recourse. CASH RESERVE "As protection against dealer's share of responsibility under the I.S.C. plan, a cash credit reserve is set aside for the dealer *80 out of I.S.C. charge where approved rate charts are used, as follows: * * *
"USED CARS On 12 months 8% plus $10.00 plus insurance plus Credit Life at net rate of 50" per $100.00 per year. Above charges and reserves pro-rated on over or under 12 month transactions. "The above cash reserves will be held by I.S.C. to the credit of the dealer and from time to time, I.S.C. shall charge against this reserve account any losses which may be incurred in relation to any notes purchased hereunder. As of January 31st and July 31st of each year, I.S.C. will pay so much of such reserves as is in excess of Seven per cent (7%) of the then aggregate unpaid balances outstanding on notes purchased from dealer hereunder, provided, that no payments need be made by I.S.C. hereunder if any indebtedness of the dealer hereunder is unpaid at the time of such settlement. Such reserve shall at all times be subject to set-off by I.S.C. and subject to any indebtedness, liquidated or unliquidated which dealer may owe I.S.C. DURATION "All of above agreements between I.S.C. and dealer shall continue effective as to notes and contracts purchased by I.S.C. until the same are fully paid, although dealer *81 may have ceased to sell notes to I.S.C. or I.S.C. to buy the same from the dealer. In either such event, I.S.C. may if and as it shall elect, hold and apply all reserves until all notes purchased by it from the dealer have been fully paid. I.S.C. may grant extensions to purchasers and consent to transfers between purchasers without impairing the dealer's obligations hereunder. Nor shall any such rights or obligations be affected by any act or omission of I.S.C. in making collections, repossessions or resales. No waiver or change in the terms of this orany other Agreement between I.S.C. and dealer shall be binding on I.S.C. unless evidenced in writing signed by a duly authorized officer of I.S.C." Purchasers of cars from petitioner on a time payment plan executed a note for the unpaid purchase price and a chattel mortgage on the property as security for payment of the note. The notes set forth the charges made and the number of payments required to liquidate the obligation. Typical of the notes and the charges made is one executed during the taxable year for $1,591.20 in connection with the sale of a car for $2,016.95 against which $753.95 was credited for a car taken in trade, leaving *82 $1,263 as the unpaid balance of the purchase price. The difference of $328.20 between the amount of the deferred purchase price and face amount of the note consisted of $166.74 for interest, $126.50 for insurance, $10 for a flat charge, and $24.96 for the dealer's reserve. The total of $1,591.20 was to be liquidated in 18 monthly payments, each in the amount of $88.40. Petitioner received from Interstate in the transaction $1,263 in cash and a credit of $24.96 in the reserve account kept by Interstate under the agreement. The amounts credited to the reserve account were entered in petitioner's books as deferred income. It maintained no record of liability to Interstate on the notes. Some of the cars repossessed by Interstate were purchased by petitioner at a price agreed upon in each transaction. Petitioner generally agreed upon a price in excess of the value of the car and gave Interstate a check for the amount. At times the purchase price was charged to the reserve account on the books of Interstate. In the event the agreed price was less than the unpaid amount of the outstanding note, after adjustments, the difference was charged to the reserve account. During the taxable year *83 petitioner paid to Interstate a total of $4,831.16 for cars repossessed, upon which it had a net gain of $9.74 on resale within the same year. Interstate charged the amount of $1,293.82 to petitioner's reserve account in connection with the transactions. In addition thereto, Interstate charged to the account $603 for cars repossessed and sold by it. Petitioner never received any payments in cash out of the account. The credit balance in the reserve account at the close of the taxable year was $9,685.60. The unpaid balance at that time of the notes held by Interstate was $92,580. During the latter part of 1950 the agreement was modified in regard to payment of some part of the amount in the reserve account and another reserve account, known as No. 2, was set up on the books of Interstate. About March 7, 1951, petitioner discontinued the sale of notes to Interstate under the agreement. The credit balance in the original account was $14,354.50 on May 31, 1950, $2,651.88 on May 31, 1951, and $120.63 on September 11, 1951. The credit balance in account No. 2 on May 31, 1950, was $1,457.02 and on September 14, 1951, $860.77. In his determination of the deficiency respondent held that *84 the balance of $9,685.60 in the reserve account on May 31, 1949, constituted income to petitioner in the taxable year under the provisions of section 22 (a) of the Code. Opinion Petitioner kept its books and filed its return for the taxable year on an accrual basis of accounting. Whether or not the amount in controversy is includible in gross income depends upon whether it accrued to petitioner. Petitioner relies on , and respondent argues that the facts here are, in all material respects, the same as those in , and two Memorandum Opinions of this Court, in which the reasoning of the case was followed. The reported cases relied upon determined the question by applying the rule announced in , on when an amount accrues for taxation. There the Court said: "* * * Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right *85 to receive an amount becomes fixed, the right accrues. * * *" In the Keasbey & Mattison Co. case, supra, a finance company discounted notes executed by home owners for asbestos products produced by the appellant at 7 per cent, 5 of which it retained for its services and the remainder was placed in a reserve fund to liquidate possible losses sustained by it on the notes. The agreement authorized the finance company to charge the reserve account with notes delinquent more than 60 days and provided for payment to Keasbey & Mattison Company on January 3 each year of the amount in the fund in excess of 10 per cent of the unpaid balance on all notes discounted under the plan. As additional security for the finance company, the appellant assumed liability to the finance company for payment of 10 per cent of the notes, less the amount in the reserve fund. In holding that the balance in the reserve fund at the close of the year was nonaccruable, the court pointed out that if a contrary conclusion were reached "* * * there could be little less reason for holding the plaintiff's additional liability to be likewise accruable". The Shoemaker-Nash, Inc., case, supra, involved the sale of notes *86 received for the deferred purchase price of automobiles to finance companies under contracts essentially the same as the agreement here. In holding that the profit realized from the sale of the notes was accruable at the time they were sold, we said: "* * * For, although the amount of the reserve credit is not immediately paid and does not become immediately payable, there is no showing that it will not be collectible when due or that its collection in the future is improbable. * * *" The case was distinguished by the court in the Keasbey & Mattison Co. case, supra, by saying, among other things, that "The 'reserve' was in reality nothing more than a plan set up by the finance companies to provide for payment to the taxpayers (automobile dealers) of a portion of the purchase price of the notes". Here, as in the Shoemaker-Nash, Inc. case, the sale of the notes was a necessary part of the business being conducted. The amounts credited to petitioner on the books of Interstate in connection with sales of the notes were to be paid in cash or to satisfy obligations of petitioner to the debtor, even though not incurred under the terms of the agreement. Following that case, we hold *87 for the respondent. Decision will be entered for the respondent.